THE STATE OF NEW HAMPSHIRE
SUPREME COURT

No. 2007-0399

The State Of New Hampshire

v.

Karl Parkhurst

---

APPEAL PURSUANT TO RULE 7 FROM A JUDGMENT OF
THE HILLSBOROUGH COUNTY SUPERIOR COURT
FOR THE NORTHERN JUDICIAL DISTRICT

---

BRIEF FOR THE STATE OF NEW HAMPSHIRE

THE STATE OF NEW HAMPSHIRE

Kelly A. Ayotte
Attorney General

Nicholas Cort
Assistant Attorney General
Criminal Justice Bureau
33 Capitol Street
Concord, N.H. 03301-6397
(603) 271-3671

(Five minutes, 3JX)

## TABLE OF CONTENTS

Page

Table of Authorities ..................................... ii

Question Presented....................................... 1

Statement of the Case.................................... 2

Statement of Facts....................................... 3

Summary of Argument ..................................... 8

Argument

    I.    THE TRIAL COURT ERRED WHEN IT DENIED
        PARKHURST'S MOTION TO EXCLUDE CERTAIN
        SEXUALLY GRAPHIC STATEMENTS HE MADE TO
        THE POLICE, BECAUSE THEY WERE IRRELEVANT
        AND UNFAIRLY PREJUDICIAL....................... 9

Conclusion............................................... 15

Appendix A1-A16.......................................... A1-A21

## TABLE OF AUTHORITIES

Page

**CASES**:

State v. Beltran, 153 N.H. 643, 904 A.2d 709 (2006)........ 12

State v. Carter, 140 N.H. 1, 662 A.2d 289 (1995)........... 10

State v. Cook, 148 N.H. 735, 813 A.2d 480 (2002)........... 10

State v. Gruber, 132 N.H. 83, 562 A.2d 156 (1989).......... 10

State v. Higgins, 149 N.H. 290, 821 A.2d 964 (2003)........ 10

State v. Hurlburt, 135 N.H. 143, 603 A.2d 493 (1991)....... 12

State v. Pelkey, 145 N.H. 133, 756 A.2d 598 (2000)......... 13

State v. Richardson, 138 N.H. 162, 635 A.2d 1361 (1993).... 10

State v. Sawtell, 152 N.H. 177, 872 A.2d 1013 (2005)....... 10

State v. Stott, 149 N.H. 170, 816 A.2d 1018 (2003)......... 10

QUESTION PRESENTED

Whether the trial court erred when it denied Parkhurst's motion to exclude certain sexually graphic statements he made to the police, because they were irrelevant and unfairly prejudicial.

Issue preserved by Defendant's Motion in Limine #1 – Defendant's Statements, App.* at A1-A4; State's Objection, App. at A5-A16; trial court's order denying motion, App. at A17-A21.

---

*Citations to the record are as follows:
"NOA" designates the notice of appeal;
App." designates the appendix to the brief;
"T-I" through "T-III" designate citations to separate volumes of trial transcript;
"T-IIa" designates Part Two of the transcript of trial proceedings on March 6, 2007.

STATEMENT OF THE CASE

A Hillsborough County (North) grand jury indicted Karl Parkhurst with four counts of aggravated felonious sexual assault. Two alleged that he committed the offense by engaging in sexual penetration with K.M., a member of his household, before she turned sixteen. The other two alleged that he engaged in sexual penetration with K.M. after she turned sixteen, but before she turned eighteen, and that the sex was the product of coercion by virtue of his position of authority over K.M. T-I 53-55. Parkhurst was K.M.'s legal guardian. T-I 128.

After trial, the jury acquitted Parkhurst of the conduct alleged to have occurred before K.M. turned sixteen, and convicted him of the other two charges. T-III 55-57. The trial court (Barry, J.) sentenced Parkhurst to serve consecutive terms of 10-20 years in prison. NOA 2.

STATEMENT OF FACTS

Karl Parkhurst married Kathy Maynard in 1999.  T-I 127; T-IIa 209.  She had a daughter, K.M., who was eleven, and a son, Kendrick, who was nine.  T-II 116.  The family initially lived on Brown Avenue in Manchester, and subsequently moved to Conant Street.  T-I 125; T-IIa 215.

Kathy Maynard died on January 27, 2001, two days before K.M.'s thirteenth birthday.  T-I 128; T-IIa 212.  Parkhurst became the legal guardian of K.M. and Kendrick on March 19, 2001. T-I 128; T-IIa 215; T-III 41.  They lived on Conant Street until November 6, 2003.  T-I 129; T-IIa 219.  For part of that time, Parkhurst's girlfriend, Gail, also lived there, as did his nephew, Jared.  T-I 163-64; T-II 70-71; T-IIa 218.  Parkhurst, K.M. and Kendrick moved from Conant Street to Kimball Street on November 6, 2003, and remained there until July 15, 2004.  T-I 129; T-IIa 219.  Subsequently, they moved into a three-bedroom apartment on Dubuque Street.  T-I 129; T-IIa 225.

One day, when they lived on Conant Street, K.M. told her friend, Amber Brown, that Parkhurst had been touching her in a way that made her feel uncomfortable, and showed Amber and Jared a poem she had written.  T-I 134-35; T-II 62-63, 72.  According to K.M., Parkhurst would hug her, and occasionally would touch her buttocks while doing so.  T-I 132.  She did not allege that he engaged in any other inappropriate conduct.

-3-

Jared agreed to speak to Parkhurst on K.M.'s behalf.  T-I 136; T-II 64, 74.  Parkhurst told Jared that nothing inappropriate happened.  T-II 79.  After that, Parkhurst assured K.M. that he would stop hugging her.  T-IIa 217.  According to K.M., he did stop.  T-I 137-38.

When the family moved to Kimball street, K.M. was about three months shy of her sixteenth birthday.  T-I 140.  She testified that before she turned sixteen, Parkhurst asked if he could perform oral sex on her, look at her breasts and buttocks, and lick her "butt."  T-I 140.  At her deposition, however, K.M. was not certain that any sexual contact occurred before her sixteenth birthday.  T-II 14-22.  Indeed, the jury acquitted Parkhurst of the two charges alleging he had sex with K.M. before she turned sixteen.  T-III 56-57.

K.M. testified she initially declined Parkhurst's requests, but ultimately gave in because she feared that if she did not, she and Kendrick would be separated, a prospect that terrified her.  T-I 132, 147.  At the deposition, however, K.M. contradicted herself with regard to whether Parkhurst explicitly threatened to separate her from Kendrick if she did not perform a sexual act.  Compare T-II 24 (never explicitly threatened to split them up if did not engage in sex) with T-II 44 (Parkhurst said to K.M., "you'll lose each other," if she did not engage in sex).  Over defense objection, the trial court allowed Kendrick

-4-

to testify that K.M. told him the only reason she had sex with Parkhurst was so that he and K.M. could stay together.    T-II 127-28.

According to K.M., she and Parkhurst began to have intercourse after they moved to Dubuque Street.    T-I 148-49. They had intercourse two or three times a week.    T-I 173.    Some nights, she and Parkhurst stayed in the same bed all night.    T-I 173.    Parkhurst spoke of wanting to marry K.M., and he bought her an engagement ring.    T-I 174-75; T-III 227.

In March of 2005, K.M. became pregnant with Parkhurst's child.    T-I 151.    Parkhurst told K.M. the decision to have the child was hers, but he wanted her to keep it.    T-I 177.    K.M. initially did not tell anyone who the real father was, even though Parkhurst wanted her to tell his family that the child was his.    T-I 178, 180.    On July 23, 2005, K.M. told her "Big Sister" Denise McKinnon, and her friend's mother, Sandra Tremblay, that she was pregnant with Parkhurst's child.    T-I 97-101, 182-83; T-II 112-15.    They called the Manchester Police.    T-I 99, 183; T-II 115.

Parkhurst, who testified at trial, agreed that he had a sexual relationship with K.M., but said that no sexual act occurred before she turned sixteen, and none was coerced.    T-III 220-23, 226, 265, 267, 280, 290.    Parkhurst gradually began to fall in love with her, and when he expressed his feelings, in

-5-

February of 2004, K.M. said she felt the same.  T-III  220-21,
274.  He felt, from K.M.'s demeanor and words, that she was
comfortable with his requests, as well as the sexual
relationship.  T-III 267-68.  K.M. told the police that the sex
was consensual, that she liked it, and that it did not bother
her.  T-I 184; T-II 38.  At trial, however, she testified that
the first time she had sex it was not consensual, and she only
liked the more recent sexual activity.  T-II 34, 36, 38.

    Manchester Officer Paul Fraitzl spoke to K.M. briefly on the
night of July 23, 2005.  T-II 130-46.  After speaking to K.M., he
told Parkhurst that K.M. would be staying with McKinnon due to an
"investigation."  T-II 139.  The next morning, Parkhurst called
McKinnon's house and asked to speak to K.M.  T-I 103.  He told
McKinnon that he knew K.M. was pregnant and that he was the
father.  T-I 103.  Parkhurst then told Kendrick that he was the
father of K.M's child, and went to the Manchester Police
Department.  T-II 126, 152; T-III 238.

    At the police station, Parkhurst told the dispatcher that he
had gotten his stepdaughter pregnant and wanted to talk to
someone.  T-II 152.  Detective Craig Rousseau met Parkhurst and
interviewed him.  T-II 153.  During the interview, which Rousseau
did not record, T-II 184, Parkhurst admitted to the sexual
relationship, but said nothing happened before K.M. turned
sixteen.  T-II 154-59, 169, 192.  Over defense objection,

-6-

Rousseau testified that Parkhurst said "[h]e ask[ed] to taste her vagina, or to lick her vagina, because he want[ed] to see what a virgin tast[ed] like." T-II 158.

Parkhurst also wrote out a statement for the police. T-II 164. At trial, the State blew up a copy of the statement (State's Exhibit 1) and had Detective Rousseau read it into the record. T-II 164. The written statement included Parkhurst's admission that he "asked [K.M.] if [he] could taste her. . . ." T-II 164; see App. at A16 (Parkhurst's written statement). During his direct examination, defense counsel asked Parkhurst to explain this sentence, and he said he wrote it that way "[b]ecause of the fact that [he had] never been with a virgin before," and "[t]hat was basically the only way I knew how to talk about [oral sex]." T-IIa 240. The State questioned Parkhurst about this statement again on three separate occasions during his cross-examination. T-IIa 267-68, 293, 296-97.

SUMMARY OF THE ARGUMENT

The trial court erred when it admitted sexually explicit statements Parkhurst made to the police. These statements lacked probative value because Parkhurst did not dispute his sexual interest in K.M., or that he had sex with her. The statements also did not tend to demonstrate that he had sex with K.M. before she turned 16, as two of the indictments alleged. On the other hand, however, the statements were prejudicial in themselves, and their prejudicial impact was increased by virtue of their repetition throughout the second half of the trial.

The court's error mandates reversal of Parkhurst's convictions.

-8-

I.  THE TRIAL COURT ERRED WHEN IT DENIED PARKHURST'S MOTION TO
    EXCLUDE CERTAIN SEXUALLY GRAPHIC STATEMENTS HE MADE TO THE
    POLICE, BECAUSE THEY WERE IRRELEVANT AND UNFAIRLY
    PREJUDICIAL.

The morning after Parkhurst learned that K.M. identified him

as the father of her child, he went to the Manchester Police

Department and voluntarily spoke to detectives.  During the

interview, Parkhurst admitted he had a sexual relationship with

K.M.  Parkhurst told Detective Rousseau that he asked K.M. "if he

could lick her vagina [because] he `wanted to see what a virgin

tasted like.'" T-II 158.  Parkhurst subsequently wrote a

statement in which he said he "asked [K.M.] if [he] could taste

her. . . ."  T-II 164.

Parkhurst did not challenge the admissibility of his

statements on <u>Miranda</u> or voluntariness grounds.  Rather, he moved

<u>in limine</u> to exclude them under Rules of Evidence 401, 403, and

404(b).  <i>App.</i> at A1-A4.  Parkhurst argued that the statements

were not relevant, and given their graphic nature, were unfairly

prejudicial.  App. at A2-A3.  The State disagreed on both counts,

and the trial court admitted the statements.  App. at A17-A20.

The court ruled that they were probative of Parkhurst's

"awareness of his actions," and, "[w]hile [they] are certainly

crass, they are not of such a nature as to require exclusion."

App. at A20.  In so ruling, the trial court erred.

"To be admissible at trial, evidence must be relevant; that

is, it must have a tendency to make the existence of any fact

-9-

that is of consequence to the determination of the action more
probable or less probable than it would be without the evidence."
State v. Higgins, 149 N.H. 290, 297 (2003)(quotation omitted).
"Although relevant, evidence must be excluded if its probative
value is substantially outweighed by the danger of unfair
prejudice. . . ." State v. Sawtell, 152 N.H. 177, 181
(2005)(quoting N.H. R. Ev. 403).

Thus, when determining whether to admit evidence, the court
considers how necessary it is, in light of the issues at trial,
and its tendency to create unfair prejudice. See, e.g., State v.
Carter, 140 N.H. 1, 5 (1995)("`Particularly pertinent to
determining [the balance between prejudice and probative worth]
is whether the evidence is relevant to prove an issue that is
actually in serious dispute.'")(quoting State v. Richardson, 138
N.H. 162, 166 (1993)); State v. Gruber, 132 N.H. 83, 89
(1989)("Whether the issue is in dispute should be considered by
the trial court in determining whether the prejudicial effect of
the evidence outweighs its probative value.")(quotation omitted);
State v. Cook, 148 N.H. 735, 741 (2002)(photo of victim
irrelevant to any genuinely contested issue at trial).

These principles apply with equal force where the contested
evidence is statements by the defendant to the police. State v.
Stott, 149 N.H. 170, 172-73 (2003). Stott was charged with
sexually assaulting a seven year-old girl. He denied any sexual

-10-

misconduct.  Id. at 171.  During an interview with the police,
Stott made five, discrete statements that he sought to exclude as
evidence at trial, arguing that they were irrelevant and unfairly
prejudicial.  Id.  The statements were that he did not want to
die in jail; he viewed prosecutors as "persecutors;" laws were
not "infallible;" he no longer had sex with his wife; and he
"followed the laws of God."  Id.  This Court found no error in
admitting any of these statements.  The Court held that they were
"extremely probative of [Stott's] consciousness of guilt . . .
[and did] not admit any wrongdoing, disclose any prior bad acts
or address any emotionally charged issues, such as child abuse,
that would make a jury more likely to find the defendant guilty
of sexually molesting the victim."  Id. at 173.

    This case is different from Stott in terms of both the
probative value of the statements at issue, and their prejudicial
impact on the jury.  Parkhurst never denied a sexual relationship
with K.M.  The only contested issues were the time frame of that
relationship, and whether it was coerced or consensual.  The
statements demonstrated Parkhurst's sexual interest in K.M., and
his particular interest given the fact that she was a "virgin."
However, Parkhurst's level of sexual interest was not in dispute,
and the specification that he "wanted to see what a virgin tasted
like," under the facts of this case, made it no more likely that
he had sexual contact with K.M. before she turned sixteen.  Thus,

-11-

while Stott's statements had a peculiar tendency to demonstrate his consciousness of guilt of the charged offenses, Parkhurst's neither had that tendency, nor assisted the jury in determining whether the sexual contact began before K.M. turned sixteen, or was the product of coercion.

In contrast to their low probative value, the prejudicial impact of the contested statements was high.   The prejudice derived from two sources.  First, the statements themselves "ha[d] the purpose and effect of appealing to [the] jury's sympathies, arousing its sense of horror, provoking its instinct to punish, or triggering other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." State v. Beltran, 153 N.H. 643, 649 (2005).  Parkhurst's expression of interest in "seeing what a virgin tasted like" is beyond "crass."  Instead of proving contested issues, the statement's tended to impair the jury's ability to fairly and dispassionately evaluate the evidence, and reach a verdict based solely on that evidence.

Second, the prejudicial impact of the statement was exacerbated by virtue of its emphasis and repetition during the course of the trial. Compare State v. Hurlburt, 135 N.H. 143, 145 (1991)("[T]he robbery conviction was introduced into evidence without emphasis. . . . No further mention of the conviction was made to the jury at the time of introduction, and the exemplified

-12-

copy of the conviction contained no mention of the elements or
the nature of the robbery.") with State v. Pelkey, 145 N.H. 133,
137-38 (2000)(citing prejudicial impact stemming from repetition
of improperly admitted evidence).  In this case, the prosecution
elicited the contested statement during the direct examination of
Detective Rousseau.  T-II 158.  It then had Rousseau repeat the
statement when he read Parkhurst's written statement to the
police.  T-II 164.  Further, it introduced the statement as part
of State's Exhibit 1, a blown-up version of Parkhurst's written
statement.  Finally, the State cross-examined Parkhurst
extensively on the statement, thereby exacerbating its
prejudicial impact.  T-IIa 267-68 (" Q  And that's when you said
to her, can I taste you?  A Yes."), 293-94 ("Q   Right.  And you
told her you wanted to see what a virgin tasted like?  A  Yes.").
By the third foray into this topic, the judge had to interrupt
the prosecutor and tell her to move on.  T-IIa 297-98 ("Q  But
you wanted to include in there that you had asked [K.M.] to taste
- if you could taste her?  A  Yes.  Q  And you knew she was a
virgin, and you wanted to see what a virgin tasted like?").

. Accordingly, evidence with minimal probative value, but
substantial potential to induce an emotional reaction against
Parkhurst, played a prominent role in the prosecution's case
against Parkhurst.  Given the fact that the jury acquitted
Parkhurst of two charges, the evidence against him was not

-13-

overwhelming.  Under these circumstances, the trial court's erroneous admission of Parkhurst's comments, and the State's repeated reference to those comments, rendered the trial unfair. Parkhurst is entitled to a new trial.

CONCLUSION

WHEREFORE, Mr. Parkhurst respectfully requests that this Honorable Court reverse his convictions and remand his case for a new trial.

Five minutes of oral argument before a 3JX Panel of this Court is requested.

Respectfully submitted,

By_____
David M. Rothstein
Deputy Chief Appellate Defender
Appellate Defender Program
2 White Street
Concord, NH  03301

CERTIFICATE OF SERVICE

I, hereby certify that two copies of the foregoing Brief have been mailed, postage prepaid, to the Office of the Attorney General, 33 Capitol Street, Concord, New Hampshire  03301, this 17th day of December, 2007.

_____
David M. Rothstein

DATED:  December 17, 2007

-15-

# APPENDIX

## TABLE OF CONTENTS - APPENDIX

Page

Defendant's Motion in Limine #1 - Defendant's Statements... A1

State's Objection to Defendant's Motion in Limine #1 -
Defendant's Statements/Request to Seal..................... A5

-A-

THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH COUNTY SUPERIOR COURT

HILLSBOROUGH, SS.                                    February, 2007

STATE OF NEW HAMPSHIRE

v.

KARL PARKHURST
#06-S-1767-70

## DEFENDANT'S MOTION IN LIMINE #1 – DEFENDANT'S STATEMENTS

Karl Parkhurst respectfully moves this Honorable Court to exclude several of Mr.

Parkhurst's statements to the Manchester Police Department. Specifically, the defendant moves the

court to exclude the following:

a.   An oral statement to Detective Craig Rousseau that. "He eventually began asking
     [K.M] if he could lick her vagina. He said that he told her that he 'wanted to see
     what a virgin tasted like'. She eventually let him and the relationship began from
     there."

b.   A written statement of Karl Parkhurst, which contains the following relevant
     portion: "In March 2004 I asked [K.M.] if I could taste her and she said I could for
     the first time . . ."

c.   Any statements of the defendant not previously provided in discovery.

In support of this Motion, Mr. Parkhurst states as follows:

1.   Mr. Parkhurst is charged with four counts of Aggravated Felonious Sexual Assault.

2.   Indictment 06-S-1767 alleges that Mr. Parkhurst "knowingly engaged in sexual

penetration with K.M., to wit, sexual intercourse, the said K.M. being at the time 13 years of age or

older and under 18 years of age and not his legal spouse and Parkhurst was in a position of authority

over K.M. as her legal guardian and used this authority to coerce K.M. to submit."

A1

2

3.      Indictment 06-S-1768 alleges that Mr. Parkhurst "knowingly engaged in sexual penetration with K.M., to wit, cunnilingus, the said K.M. being at the time 13 years of age or older and under 18 years of age and not his legal spouse and Parkhurst was in a position of authority over K.M. as her legal guardian and used this authority to coerce K.M. to submit."

4.      Indictment 06-S-1769 alleges that Mr. Parkhurst "knowingly engaged in sexual penetration with K.M., to wit, cunnilingus, the said K.M. being at the time 13 years of age or older and under 16 years of age and not his legal spouse, and Parkhurst was a member of the same household as K.M."

5.      Indictment 06-S-1770 alleges that Mr. Parkhurst "knowingly engaged in sexual penetration with K.M., to wit, Parkhurst penetrated the anal opening of K.M. with his tongue, the said K.M. being at the time 13 years of age or older and under 16 years of age and not his legal spouse, and Parkhurst was a member of the same household as K.M."

6.      The relevant issues in indictments 06-S-1767-8 are whether Mr. Parkhurst was in a position of authority over K.M. and whether he used that authority to coerce her to submit.   The relevant issue in indictments 06-S-1769-70 is whether any sexual penetration occurred between Mr. Parkhurst and K.M. prior to her sixteenth birthday.

7.      At trial, the defense will not be arguing that sexual penetration did not occur between Mr. Parkhurst and K.M.   Rather, the defense will be arguing that sexual penetration occurred, but began after K.M.'s sixteenth birthday and that Mr. Parkhurst was not in a position of authority over K.M. and did not use that authority to coerce her to submit.

8.      Because Mr. Parkhurst will be conceding to the fact that cunnilingus occurred between he and K. M., the statements referenced in paragraphs (a) and (b) are not relevant to any issue actually in dispute. His concession removes the issue of whether sexual penetration occurred

A2

from the jury, leaving them only with the issues of when the sexual penetration occurred and whether Mr. Parkhurst was in a position of authority over Kendra M. and used his authority to coerce her to submit.  See, e.g. State v. Glodgett, 144 N.H. 687 (2000) (holding that defendant's concession of the issue of intent removed the issue from dispute and thus trial court abused its discretion by admitting uncharged misconduct to prove defendant's intent).  Thus, these statements have no probative value and should be excluded under Rules 401 and 404(b).

9.    The statements are also highly prejudicial and should be excluded under N.H. Rule of Evidence 403.   Any marginal relevancy that exists in these statements is vastly outweighed by the danger of unfair prejudice to the defendant.  The wording of the statements themselves are graphic descriptions of cunnilingus and Mr. Parkhurst's motivations for wanting to perform cunnilingus on K.M.  Because of their graphic description, these statements could be offensive to many jurors.  The statements may inflame the jury, and cause the jury to base it's decision on something other than the facts at issue in the case.  As such, they should be excluded.

10.    Finally, Karl Parkhurst requests that the Court exclude evidence of any statements allegedly made by Mr. Parkhurst which have not yet been disclosed.  Superior Court Rule 98(A)(1) requires the State to provide a copy of the defendant's statements which are intended for use as evidence by the State at trial.  Any statement not disclosed should be excluded under Rule 98(J)(iii) prohibiting the party from introducing the evidence not disclosed.  See also State v. Smalley, 148 N.H. 66 (2002) (holding trial court committed reversible error in failing to strike defendant's statement that was not previously disclosed under Rule 98).

WHEREFORE, Karl Parkhurst respectfully requests that this Honorable Court exclude:

a)    Exclude the statements referenced in paragraphs (a) and (b) above.

A3

4

b)      Any statements not previously disclosed to the defense under Superior

Court Rule 98.

Respectfully submitted,


Tamara Fisher
Caroline Brown
New Hampshire Public Defender
20 Merrimack Street
Manchester, NH 03101
(603) 669-7888


## CERTIFICATE OF SERVICE

I, Tamara Fisher, hereby certify that a copy of the foregoing Motion has been forwarded this
_26_ day of February, 2007 to Assistant County Attorney Jennifer Sandoval.


Tamara Fisher

A4

THE STATE OF NEW HAMPSHIRE

SUPERIOR COURT

HILLSBOROUGH-NORTH, SS                    FEBRUARY TERM, 2007
DOCKET NOS. 06-S-1767-1770

STATE OF NEW HAMPSHIRE

V.

KARL PARKHURST

## STATE'S OBJECTION TO DEFENDANT'S MOTION IN LIMINE #1 – DEFENDANT'S STATEMENTS/REQUEST TO SEAL

NOW COMES the State of New Hampshire, by and through the Hillsborough County

Attorney's Office, with this Objection to the Defendant's Motion in Limine #1 – Defendant's

Statements. In support thereof, the State says as follows:

## FACTS

1. Karl Parkhurst ("Defendant") is charged with four counts of Aggravated Felonious Sexual
   Assault. The victim of these offenses, K.M. is the Defendant's stepdaughter. The Defendant
   became involved in a relationship with the victim's mother when the victim was
   approximately seven years old. Eventually, the Defendant and the victim's mother were
   married.

2. Two days prior to the victim's thirteenth birthday, the victim's mother passed away from a
   longstanding illness. The Defendant immediately petitioned for and was granted
   guardianship of both the victim, K.M. and her younger brother. The Defendant is the only
   father figure that both K.M. and her brother have ever known.

3. On July 23, 2005, the Manchester Police Department was contacted by K.M's friend Denise
   McKinnon. Ms. McKinnon contacted the police department to report that she had just

A5

learned that K.M. was four months pregnant with the Defendant's child. At the time the report was made to the police, K.M. was seventeen years old.

4.  K.M. disclosed to the police that the Defendant had been having intercourse with her and that she was pregnant with his child. In subsequent interviews and in a subsequent deposition of the victim, she disclosed more details of the sexual abuse she endured. Specifically, K.M. disclosed that the Defendant began making sexually inappropriate comments to her shortly after her mother passed away. The Defendant would also inappropriately touch K.M.'s buttocks at times when he was hugging her.

5.  K.M. testified under oath at her deposition that there were two incidents of sexual abuse prior to her sixteenth birthday. K.M. disclosed that just prior to her sixteenth birthday, the Defendant performed cunnilingus on her after he made repeated requests to do so and further that he penetrated her anal opening with his tongue.

6.  Further, K.M. testified under oath at her deposition, that the sexual abuse continued after her sixteenth birthday. Specifically, the Defendant had intercourse with her and performed cunnilingus on her. K.M. testified that she acquiesced to the Defendant's requests because of his position of authority of her and her brother as their legal guardian. K.M. testified that she was terrified of the Defendant and terrified that the Defendant would no longer be her guardian and therefore she would be separated from her brother. Because of these fears, K.M. submitted to the Defendant's requests.

7.  The Defendant was interviewed by Detective Craig Rousseau of the Manchester Police Department. During the course of this interview, the Defendant made a number of

2

A6

admissions to the Detective. (See Attached Police Report).  After the interview was completed, the Defendant also wrote a one page written statement also containing admissions to the crimes he is presently charged with.  (See Attached Written Statement of Defendant).

8.  The Defendant has been indicted by the Hillsborough County Grand Jury for four counts of Aggravated Felonious Sexual Assault.  Two of the indictments (06-S-1769 and 06-S-1770) are for sexual acts occurring before K.M.'s sixteenth birthday.   The remaining two indictments (06-S-1767 and 06-S-1768) are for sexual acts occurring after K.M.'s sixteenth birthday.

9.  The Defendant now moves to exclude the following:

    a.  An oral statement to Detective Craig Rousseau that "He eventually began asking [K.M] if he could lick her vagina.  He said that he told her that he 'wanted to see what a virgin tasted like.' She eventually let him and the relationship began from there."

    b.  A written statement of Karl Parkhurst which contains the following relevant portion, "In March, 200r I asked [K.M.] if I could taste her and she said I could for the first time...."

    c.  Any statements of the Defendant not previously provided in discovery.

The State objects to the Defendant's argument that the statements listed in subparagraphs (a) and (b) above are inadmissible as irrelevant and unfairly prejudicial.

## LEGAL ARGUMENT

10. The Defendant argues that the Defendant's statements in subparagraphs (a) and (b) above are

3

A7

irrelevant and not probative of any issue in dispute because the defense intends to concede that sexual penetration occurred between the Defendant and K.M but only after her sixteenth birthday and not before.   As stated in Paragraph 7 of the Defendant's Motion in Limine # 1, the Defendant will not concede that there was any sexual penetration prior to K.M.'s sixteenth birthday (as charged in indictments 06-S-1769 and 06-S-1770).  Nor will he concede that he was in a position of authority over K.M. and used that position of authority to coerce K.M. to submit (as charged in indictments 06-S-1767 and 06-S-1768).

11. New Hampshire Rule of Evidence 401 states that, "[r]elevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  The State is required to prove all the elements of the charged offenses, and the Defendant's statements are relevant to the elements that the Defendant plans to contest:  the element of sexual penetration in indictments 06-S-1769 and 06-S-1770; the element of position of authority and using that position of authority to coerce the victim to submit in indictments 06-S-1767 and 06-S-1768; the mental state of knowingly in each of the four pending indictments.   Therefore, the statements are relevant under Rule 401 and admissible under Rule 402.

12. Next, the Defendant argues that the graphic description in the statements may inflame the jury and cause them to base their decision on something other than the facts of the case. Def.'s Mot. in Limine, ¶ 9.  Therefore, the Defendant argues that these statements should be excluded under New Hampshire Rule of Evidence 403.

4

*A8*

13. Clearly, the statements are prejudicial because they are the Defendant's admissions to the crimes he is presently charged with. The Court, however, will admit even prejudicial evidence so long as the effect of that evidence does not "appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action" that would cause a jury to convict a defendant on something other than the admissible evidence at trial. State v. McGlew, 139 N.H. 505, 510 (1995).

14. While this motion is not related to prior bad act evidence, because the balancing tests for unfair prejudice under Rule 403 and Rule 404(b) are the same, the Court should consider the balancing test of State v. Carter, 140 N.H. 1, 3 (1995). See State v. Lesnick, 141 N.H. 121, 130 (1996). In Carter, the Court held the prejudicial effect of witness statements related to *uncharged* sexual assaults, which the defendant had admitted to, substantially outweighed the probative value. Id. at 6. At trial, the victim testified "that when she was a young child the defendant would perform cunnilingus on her, force her to perform fellatio on him, force her to lick or touch his penis, sexually penetrate her with his fingers and penis, ask her to look at pornographic magazines, fondle her breasts, stick his tongue in her mouth, and rub his pelvis against her," and that the defendant would sneak into her bedroom at night and either fondle her breasts or sexually penetrate her. Carter, 140 N.H. at 3. The Court reasoned that these statements were unfairly prejudicial because the graphic and detailed testimony about prior bad acts was used as inadmissible character evidence in violation of Rule 404. Id. at 8.

15. Unlike the testimony in Carter, the Defendant's statements are not prior bad acts, and his concession only to the element of sexual penetration in indictments 06-S-1767 and 1768, as

5

A9

noted supra, does not destroy the probative value of the statements to prove the other elements of the crimes in the four pending indictments. In addition, it was not the graphic language in Carter that rendered the statements inadmissible, but rather the graphic language coupled with the lack of *any* probative value. Compare State v. Pelkey, 145 N.H. 133, 136 (2000) (noting defendant's statement unrelated to charged conduct unfairly prejudicial).

16. In this case, the Defendant said that he wanted to lick the victim's vagina, see what a virgin tasted like, and asked if he could taste her. The effect of the Defendant's statements is not to appeal to a jury's sympathies, arouse its sense of horror, provoke its instinct to punish, or trigger other mainsprings of human action so that the jury will convict him on something other than the evidence at hand. Rather, the Defendant's statements are necessary to prove the State's case. If the Defendant's logic was sound, then even indictment 06-S-1770 would be unfairly prejudicial because it states that the Defendant "penetrated the anal opening of K.M. with his tongue." In sum, the Defendant's statements, contextually indecent and offensive, are not unfairly prejudicial, and should not be excluded under Rule 403.

WHEREFORE, the State of New Hampshire respectfully requests this Honorable Court:

    a) DENY the Defendant's Motion in Limine #1 – Defendant's Statements;

    b) Seal this Motion as there are police reports and statements attached which contain information as to the victim's identity; and

    c) Schedule a hearing thereon if the Court deems it necessary; and

    d) Grant any other and further relief that this Honorable Court deems just and equitable.

6

AIO

Dated: February 25, 2007                         Respectfully submitted,

_____

Jennifer L. Sandoval
Assistant County Attorney

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the within Objection has been forwarded to Tamara Fisher, Esquire, and Caroline Brown, Esquire, of the New Hampshire Public Defender's Office on February 25, 2007.

_____

Jennifer L. Sandoval
Assistant County Attorney

7

All

```
***********************************************************************
                    MANCHESTER POLICE DEPARTMENT
                           Case Report
05-059657                  07/27/05  14:51                     Page 43
***********************************************************************
```

KM: (Laughing)

CR: Excellent.

KM: So, we can throw stuff across the hall.

CR: Excellent.  Um...I'll tell you what though, I've always wanted to be a writer too.  So, ah...ah...maybe when we both get our first books published, we can trade them off and ah...

KM: Well, I know I've had an excellent source for a story.

CR: Well, you certainly...you certainly have um...some perspectives to write about some things.

KM: Um-hm.

CR: So...and, you know what?  A lot of writers are excellent because they went through some hard times throughout their life.  And, a lot of musicians too.

KM: Um-hm.

CR: So, um...plus, I can tell you got the whole artist thing going on. You know?  Writing, maybe a little painting maybe?  Drawing?

KM: I'm not good with drawing.  I like drawing.

CR: Yup.

KM: But, I'm not all that great at it.

CR: Yup.  Well...hey, have you seen South Park?

KM: (Laughing)

CR: That's not exactly great...

KM: Yeah, it's...

CR: ...artistry either.  But, it's on TV.  So, um...all right.  Well, we'll get you out of here.  And, (inaudible).  (Inaudible).

(END INTERVIEW)

---

Supplemental:   As of 07/24/05 at 14:00 by ROUSSEAU,CRAIG,G-624843

On today's date I was working in the Juvenile Division when i was

*A12*

*********************************************************************
MANCHESTER POLICE DEPARTMENT
Case Report
05-059657                    07/27/05  14:51                    Page 44
*********************************************************************

informed that Karl Park Hurst was in the front lobby to speak with
someone in reference to this case.  Records Clerk Kristin Brodeur
informed me of this and told he stated that he had gotten his
step-daughter pregnant.  I had read the report on this case this
morning so I was familiar with the circumstances when he came into the
lobby.  The original report stated Karl's step-daughter Kendra Maynard
was four months pregnant and that she had been involved sexually with
him for several years.  I escorted Karl from the lobby into the
interview room of the Juvenile Division.  Det. Ryan Grant was present
during the interview.  Once in the interview room, even though Karl
came in on his own, I informed him he did not have to speak with me if
he did not want to and that he was free to leave at any time.  He said
he understood and wanted to talk about the situation.

Karl told us that he met Kendra's mother when Kendra was about
eight years old and her brother Kendrick was six.  He soon moved in
with her mother and eventually married.  He and Cathy Parkhurst were
married for approximately 14 months before she died four and one half
years ago of diabetes and heart attack.  Four months ago he and Kendra
started having intercourse.  He said this would occur a couple times a
week and that the two were sharing a bed almost every night.  According
to Karl, they did not always wear protection.  During this period they
also engaged in oral sex on each other at the same rate of occurance
and engage in anal intercourse on one occasion.  Kendra had not seen a
doctor yet but Karl said she recently tested positive on a home
pregnancy test.  Karl told us that he talked with Denise McKinnon this
morning and knew that she had spoken with police last night.  Karl said
he wanted to come in and "get this cleared up."  At first Karl said he
thought it was wrong that he had been having sex with Kendra since she
was "under-age."  He told me he thought under-age meant someone under
the
age of 18.  He would later tell me that he didn't think he did anything
wrong.

We asked Karl when this all happened and he said it was in the
last four months.  I then told him that Kendra told officers that the
sexual activities had been going on since the age of 13 or 14.  He said
that was untrue.  I told him that he was minimizing the situation by
telling us that he and Kendra became sexually active at the exact time
she time got pregnant.  He then said that he began performing oral sex
on Kendra in November of 2004 but there was no way anything happened
when she was under the age of 16.  We pressed Karl further telling him
he was still minimizing the situation.  He then said the first time he
performed oral sex on her was in March of 2004 when they lived in an
apartment on Kimball St.

We asked Karl how got involved in a sexual relationship with
Kendra.  He told us that after awhile Kendra reminded him of his
deceased wife.  He eventually began asking her if he could lick her
vagina.  He said he told her he wanted to "see what a virgin tasted
like."  She said she eventually let him and the relationship began from

************************************************************************
MANCHESTER POLICE DEPARTMENT
Case Report
05-059657                     07/27/05  14:51                    Page 45
************************************************************************

there.  As far as he knew Kendra has not had an other boyfriends in
past other that one boy she was seen kissing at the Mall.  He does not
believe she has had sex with anyone else besides him.  I asked him how
a 16-year-old girl would not be appalled by her step father asking to
lick her vagina. · I told him it was my opinion that the sexual activity
must have started earlier than what he was telling us for her to be
comfortable with that.  He denied that anything happened before she was
16.

    Before meeting Karl in the lobby it was discovered that he had
been
accused of sexual assault against a young girl in the past. (97-83299)
Karl denied assaulting that female and at the time of the report it
appears the victim would been 13 years old. · Karl stated that he saw a
brother of the that victim having sex with her and does not know why
she would accuse him.  He did say that the accusation led to the
breakup between he and the girl's mother.  He also said the mother
probably believes he assaulted her.  Karl did not admit to any sexual
activity with Kendra before she turned 16.  Karl did complete a written
statement saying that he is the father of her baby.  I told Karl that
based on what I had read from the initial report a warrant may be
issued for his arrest in the future.  He was escorted back to the lobby
and he left the station.

    At 1230 this date Kendra came to the station with Denise McKinnon.
I interviewed Kendra with our conversation being audio and video taped.
Kendra told me about how her mother met, became involved with, and
eventually married Karl.  She also told me about how her mother passed
away and that she is now involved in a sexual relationship with her
step-father.  She also said she believes she is four months pregnant
due to a positive home pregnancy test and several missed menstrual
cycles.  She told me that she and Karl had been having intercourse for
a little over a year and that it usually occurs about twice a week.
She told me that she has only had intercourse with Karl at their
Dubuque St address and after she had turned 16.

    I then asked her how it happened that she ended up in a sexual
relationship with her step-father.  Kendra told me that shortly after
her mother's death he began saying inappropriate things to her.  On one
occasion she told Karl that she was pretending to be a wolf.  He told
her that it she wasn't careful she would be a pregnant wolf.  This was
when she was 13.  Eventually she told him that she did not like the
things he was saying to her so he stopped.  When she turned 14 things
started escalating.  He had now started touching her rear when he
hugged her and ask her to "look at her butt" and "see her boobs."
Kendra said she let him do those things but does not know why.  She
said at times she was afraid they would lose the place they were living
in or was afraid Karl would leave her and her brother.  When Kendra
turned fifteen her relationship with Karl escalated further.  Kendra
told me that Karl would now ask her if he could "lick her butt" and eat
her out."  I confirmed with Kendra that this meant to lick her anus and

************************************************************************
MANCHESTER POLICE DEPARTMENT
Case Report
05-059657                     07/27/05  14:51                    Page 46
************************************************************************

vagina.  I asked her if she let him do this and she said yes.  She said
that after the first time he would lick her vagina about twice a week.
She said she would not always let him lick her anus and estimated it
happened on three occasions.  She said that this began in the fall when
she was 15 and continued past her 16th birthday in January.  Kendra
said she believes she was living at the Kimball St apartment at the
time.  After their move to their current address on Dubuque St.  Karl
would use his fingers and vibrators on her vagina until they finally
began having intercourse.

Kendra told me that she would like to keep her baby.  She also
said that she loves her step-father but is unsure how she loves him.
She agreed that the situation is very confusing for her.  After the
interview was over Kendra was escorted back to the lobby.  The tapes of
the interview will be placed in as evidence.  A warrant will be applied
for charging Parkhurst with AFSA.
---------------------------------------------------------------------
Supplemental:    As of 07/27/05 at 12:00 by ROUSSEAU,CRAIG,G-624843

On today's date Kendrick Maynard responded to the police station
to be interviewed in reference to this case.  Kendrick's older sister
Kendra has been involved in a sexual relationship with their
step-father Karl Parkhurst at least since she was 15-years-old.  The
sibling's mother died approximately four years ago and they have living
with Parkhurst ever since.  During that time the three have lived in
several different apartments.  Kendrick listed these as 102 Conant St.,
496 Kimball St., and 508 Dubuque St.

Kendrick told me that I wanted to speak with him in reference to
obtaining information on his step father Karl Parkhurst.  I asked why
he thought Karl was arrested.  He told me it was because Karl had
intercourse with Kendra and there was a huge age difference between the
two.  He also said he thought that Karl did not have permission to have
intercourse with her so it would probably be "considered rape."  He
also referred to the fact that Kendra is now pregnant with by Karl.

I asked Kendrick how long the sexual relationship had been going
on for and he said he had heard it was since they lived on Kimball St.
Kendrick said that he had no first hand knowledge of anything going on
between the two until his sister told him she was pregnant.  She did
not tell him who the father was but Karl admitted this to him later.
Kendrick said that even though his sister began sleeping in Karl's room
for several months he did not suspect anything.  At one point he even
said that a step-father have a sexual relationship was not that
unusual.  I told him that I thought he was trying to protect Karl and
that it was hard to believe he never suspected anything was going on
between he and Kendra.  Kendrick said he had no reason to suspect
anything was going on between Karl and Kendra.  He did admit, however,
that it was wrong for Karl to have this relationship with his sister.

This interview was recorded with the original tapes being
submitted as evidence.

A15

CASE NO.: 05-5965

# STATE OF NEW HAMPSHIRE
# UNIFORM STATEMENT FORM

Date 7-24-05    Time Began _____    Time Ended _____    Place MPD

I, KARL PARKHURST _____ give the following voluntary statement

to, DET. ROUSSEAU , DET. GRANT _____ who has identified himself as a
member of the Manchester, NH Police Department. He has advised me of the following:

KeP ✓ 1.    I HAVE THE RIGHT TO REMAIN SILENT;

kP ✓ 2.    ANYTHING I SAY CAN AND WILL BE USED AGAINST ME IN A COURT OF LAW;

cP ✓ 3.    I HAVE THE RIGHT TO TALK TO A LAWYER FOR ADVICE BEFORE ANY QUESTIONING AND TO
HAVE ONE WITH ME DURING QUESTIONING;

KeP ✓ 4.    IF I CANNOT AFFORD A LAWYER, ONE WILL BE APPOINTED FOR ME BY THE COURTS;

keP ✓ 5.    IF I DECIDE TO ANSWER QUESTIONS NOW WITHOUT MY LAWYER PRESENT, I STILL HAVE THE
RIGHT TO STOP ANSWERING AT ANY TIME.

DO YOU UNDERSTAND EACH OF THESE RIGHTS?    YES ✓ NO ___

ARE YOU WILLING TO WAIVE EACH OF THESE RIGHTS AND ANSWER QUESTIONS?    YES ✓ NO ___

Signature: Karl Parkhurst

WITNESS Gary Rousseau    WITNESS Grant P-27

where my wife Died In January To days before
Kendra's Birdday it was hard on all of us But we still
had Kendra's birthday Party, It was hard on the
Kids so I got them in to Counsil. The Kids didnt
talk about there mother as often that I wish
they would have, I try to get them to talk about
there feeling, when the Landlord tolled me that we had
to move out the Kids went to stay at
It took about 5-6 weeks before our housing came
throu so we got to move in on Kimball st.
In march 2004 I ask Kendra if I could taste her and
she said I could for the first time and a few month
later we had to move out and the kids went to stay
with Sandy and Norm. I went and stayed with my work
Parter. Me and the Kids move in on Dubuque st in stepson
me and Kendra stared making Love in november of 2004.
and that I am the father of the baby.

## THE STATE OF NEW HAMPSHIRE

HILLSBOROUGH, SS.                                    SUPERIOR COURT
NORTHERN DISTRICT

The State of New Hampshire

v.

Karl Parkhurst

06-S-1767-70

### ORDER

Defendant, Karl Parkhurst, stands indicted on four counts of Aggravated Felonious Sexual Assault, all in connection with certain alleged acts involving defendant and his step-daughter, K.M. Before the Court are defendant's Motion *In Limine* #1 and the State's Motion *In Limine* #1. The State and defendant respectively object. On February 26, 2007, the Court conducted a hearing on the aforementioned motions. Upon consideration of the parties' arguments and the applicable authority, the Court rules as follows.

### Defendant's Motion *In Limine* #1

Indictment 06-S-1767 alleges, among other things, that defendant committed Aggravated Felonious Sexual Assault (AFSA) against K.M. by sexual penetration in the form of sexual intercourse when K.M. was between the ages of 13 and 18, and while defendant was in a position of authority to coerce K.M. to submit. Indictment 06-S-1768 alleges, among other things, that defendant committed AFSA against K.M. by sexual

1

AI7

penetration in the form of cunnilingus when K.M. was between the ages of 13 and 18, and while defendant was in a position of authority to coerce K.M. to submit. Indictment 06-S-1769 alleges, among other things, that defendant committed AFSA against K.M. by sexual penetration in the form of cunnilingus when K.M. was between the ages of 13 and 16, and while defendant was a member of the same household as K.M. Finally, indictment 06-S-1770 alleges, among other things, that defendant committed AFSA against K.M. by sexual penetration in the form of penetration of her anal opening with his tongue when K.M. was between the ages of 13 and 16, and defendant was a member of the same household as K.M. All the indictments assert that defendant committed the above-described acts knowingly. Defendant concedes that the acts of penetration occurred, but contests that the acts occurred after K.M.'s sixteenth birthday, that he was not in a position of authority over K.M., and did not use any authority to coerce her to submit.

Defendant seeks to exclude the following statements from admission at trial: (1) an oral statement he made to Detective Craig Rousseau on July 27, 2005: that defendant "eventually began asking [K.M.] if he could lick her vagina. He said he told her he wanted to 'see what a virgin tasted like.' She said she eventually let him and the relationship began from there"; and (2) defendant's written statement on July 24, 2005, which states, "[i]n March 2004 I ask [sic] [K.M.] if I could taste her and she said I could for the first time . . . ."

Defendant contends that the above statements are not relevant because he concedes that the penetration alleged in the indictments occurred. Thus, defendant claims that the above statements are not relevant to any issue actually contested at this

trial. Alternatively, defendant argues that even if the statements are relevant, their probative value is outweighed by the danger of unfair prejudice. The State objects, and submits that defendant's statements are relevant to prove defendant's *mens rea*, and that the probative value is not outweighed by the danger of unfair prejudice. The Court agrees.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.H. R. Ev. 403. "Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury's sympathies, arouse its sense horror, provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." State v. Sawtelle, 152 N.H. 177, 181 (2005).

Although defendant has conceded that the acts of penetration occurred, he has not conceded the issue of his mental state. In this case, the State must prove, among other things, that defendant committed the acts of penetration knowingly. See State v. Ayer, 136 N.H. 191, 193 (1992) ("one cannot be convicted of [AFSA] without proof that the act was accompanied by a culpable mental state"); cf. State v. Hall, 148 N.H. 394, 398 (2002) (although defendant admitted to killing his mother, the issue of whether he did so knowingly was still before the jury). "A person acts knowingly with respect to

conduct or to a circumstance that is a material element of an offense when he is aware that his conduct is of such nature or that such circumstances exist." RSA 626:2, II (b) (1996). "Awareness is thus central to the concept of acting 'knowingly.'" Hall, 148 N.H. at 398.

Assuming that both statements relate to the time period alleged in the indictments, the statements defendant seeks to exclude are highly probative of his awareness of his actions, and thus are relevant to his mens rea. Moreover, the Court finds that this evidence, or its effect, would not cause the jury to decide this case on an improper emotional basis, or that such evidence would invoke the jury's sense of horror. While these statements are certainly crass, they are not of such a nature as to require exclusion. Accordingly, for the foregoing reasons, defendant's Motion In Limine #1 is DENIED.

### The State's Motion In Limine #1

On or about August 31, 2006, defense counsel deposed K.M. Following the deposition, the State asserts that defense counsel requested that the stenographer include in the deposition transcript reference to the time lapse between defense counsel's questions and K.M.'s answers thereto. This request was apparently made without the knowledge of the prosecutor, who only became aware that the time lapse was transcribed upon receipt of the deposition transcript. In the deposition transcript, a time lapse is not recorded after every question, but only after certain questions, though there appears to be no obvious pattern to which answers received reference to the time lapse.

The State seeks to preclude defense counsel from referring to the length of time between defense counsel's deposition questions and K.M.'s answers, asserting that such evidence is irrelevant, and alternatively, that any minimal relevance is outweighed by the danger of unfair prejudice. Defendant objects and submits that such evidence is relevant to K.M.'s credibility.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.H. R. Ev. 401.

The Court finds that the length of time it took K.M. to answer some of the questions posed to her has some tendency, though minimal, to reflect her credibility. A jury may consider that an inordinate delay between a question and an answer could indicate an untruthful or calculated answer. While the delay could also indicate collection of K.M.'s emotions, or be attributed to the sensitive nature of the questioning, such reasons do not negate that the evidence is also minimally relevant to K.M.'s credibility. Moreover, any prejudicial effect of the evidence can be minimized by an effective examination by the State into other possible reasons for a delayed answer. Accordingly, for the foregoing reasons, the State's Motion *In Limine* #1 is DENIED.

SO ORDERED.

Date: 5 /Man M 2007

James D. Barry
Presiding Justice

5
A2l